Filed 1/8/16  P. v. Lopez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G050865 |
| v. | (Super. Ct. No. 10CF3188) |
| ISRAEL LOPEZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, John Conley, Judge.  Affirmed.

Diane E. Berley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Defendant Israel Lopez and codefendant Frankie Esteban Giraldo were charged together in the information with the murder of Alejando Sanchez on October 13, 2010 (Pen. Code,[1] § 187, subd. (a); count one). Defendant was also charged with being a felon in possession of a firearm on October 13, 2010 (former § 12021, subd. (a)(1), repealed by Stats.2010, ch. 711, § 4, eff. Jan 1, 2012; count two), and a number of offenses alleged to have occurred on October 14, 2010, including attempted murder (§§ 664, subd. (a), 187, subd. (a); count four), shooting at an occupied motor vehicle (§ 246; count five), felon in possession of a firearm (count six), possession of heroin for sale (Health & Saf. Code, § 11351; count seven), battery (§ 242, a misdemeanor; count eight), and active participation in a criminal street gang (§ 186.22, subd. (a); count nine).[2] Giraldo was charged in a separate count with possession of ammunition by a felon (former § 12316, subd. (b)(1), repealed by Stats.2010, ch. 711, § 4, eff. Jan. 1, 2012; count three). Firearm enhancements were alleged in connection with the murder and attempted murder counts (§ 12022.53, subds. (c), (d)), and counts four, five, and six, were alleged to have been committed for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1).) Defendant was further alleged to have suffered a prior conviction for a serious felony within the meaning of section 667, subdivision (a)(1) and the "Three Strikes" law. (§§ 667, subds. (d), (e)(1), 1170.12, subds. (b), (c)(1)), and Giraldo was alleged to have suffered a juvenile adjudication for a serious felony within the meaning of the Three Strike law.

Defendant filed a motion to sever the trial of the murder and felon in possession charge (counts one and two) from the remaining charges, and to sever his trial

---

[1] All undesignated statutory references are to the Penal Code unless otherwise indicated.

[2] Count nine was dismissed when the prosecution conceded defendant's section 995 motion insofar as it related to that count.

from Giraldo's. The court ordered counts four through eight severed from the trial on counts one through three. Defendant was tried with Giraldo. Over defendant's *Aranda/Bruton*[3] objection, the court permitted the prosecution to introduce Giraldo's out-of-court statement that the video of the shooting showed defendant, known to him as "Marcos," shooting Sanchez.

The jury found defendant guilty of first degree murder and found true the allegation that he personally discharged a firearm, causing death or great bodily injury in the commission of the murder. Giraldo was acquitted. The issue of defendant's prior conviction was tried to the court. The court found the prior conviction allegations true. The court sentenced defendant on the murder charge to 25 years to life, doubled to 50 years to life under the Three Strikes law, imposed a consecutive term of 25 years to life on the firearm allegation, and an additional five-year term under section 667, subdivision (a)(1), because defendant was found to have suffered a prior serious felony conviction. Immediately thereafter, defendant pled guilty to count five, admitted the offense was committed for the benefit of a criminal street gang, and admitted his prior conviction in exchange for a concurrent term in state prison. Counts four, six, seven, and eight, and the attached enhancements were dismissed on the prosecutor's motion.

On appeal, defendant contends the trial court erred in admitting Giraldo's out-of-court statement in violation of *Aranda/Bruton*. We agree the trial court erred, but we conclude the error was harmless beyond a reasonable doubt, given the particular facts of this case.

---

[3] *People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123.

3

# I

## FACTS

On October 13, 2010, at approximately 7:30 p.m., Sanchez entered a Mexican bakery on West Edinger in Santa Ana. He was using his cell phone. Sanchez went to the area where the coffee was kept. As he was preparing his coffee, a second male, later identified as defendant, entered the bakery, approached Sanchez from behind, pointed a gun at Sanchez, and shot him multiple times. Sanchez fell to the floor on his back. Walking "a bit fast," defendant left the bakery, but returned to where Sanchez was on the floor, and aimed his gun at Sanchez again, but did not fire. Defendant then left the bakery.

The owner of the bakery called the police. When the police arrived, Sanchez was on the ground next to a container of spilled milk, a number of spent bullet casings, and a cell phone. Sanchez died at the scene from multiple gunshot wounds. A search of Sanchez's clothing produced three syringes, a clear baggie containing 45 small bindles of heroin, another baggie containing 16 larger bindles of heroin, over $1,800 in cash, an SD card for a cell phone, and two additional cell phones. A narcotics officer stated Sanchez had possessed the heroin for sale.

The bakery had a video surveillance system that recorded the shooting. It showed a silver automobile enter the parking lot. Seconds later, a red Chevrolet Blazer entered the parking lot. Shortly thereafter, Sanchez approached the bakery's door that opens onto the parking lot with what appears to be a cell phone in his left hand. He appeared to be speaking into the cell phone. Sanchez then entered the bakery and walked to the drink area to make himself a cup of coffee. During that time he appeared to be on the cell phone again, cradling it to his left ear. Two men approached the bakery's door to the parking lot together as Sanchez turned to get milk for his coffee. One entered the bakery and watched the other continue walking, where he apparently entered through

4

another door to the bakery. The bakery had two doors, one facing Edinger Avenue and the other facing the parking lot.

As Sanchez was pouring the milk into his coffee, the male who entered through the door facing Edinger Avenue approached Sanchez from behind, aimed a pistol at him and shot him. The first male immediately left the bakery and quickly walked back in the direction from which both had approached. The shooter exited right behind him, walking in the same direction, and then turned around and reentered the bakery. A witness said he returned to where Sanchez was on the ground and attempted to shoot him again. The shooter exited the bakery again and ran in the direction from which he and the other male had approached the bakery.

Police found two cars in the parking lot and had them towed as possible evidence. One of the vehicles was a silver Honda. The Honda had a set of keys on its backseat. A fingerprint was lifted from the right side mirror. The print was from defendant's left thumb. DNA was obtained from exterior and interior areas of the Honda. A buccal swab was obtained from defendant. Defendant could not be eliminated as the source of DNA found on the steering wheel and the exterior of the driver's door. The chance that the DNA had been left by someone other than defendant was less than one in one trillion.

Police showed a witness to the shooting a photo lineup containing six photographs, one of which was of defendant. The witness identified defendant and appeared to become frightened. Another witness also identified defendant as the shooter.

Police arrested defendant on October 14, 2010. At the time of his arrest, he possessed two notebooks, about $232 in cash and eight grams of heroin divided into separate bindles. A narcotics expert stated the notebooks contained what appeared to be pay/owe sheets. The expert opined that defendant possessed the heroin for sale.

On December 8, 2010, a detective contacted Giraldo at his residence a short distance from the bakery. A red Chevrolet Blazer was parked in Giraldo's driveway.

5

Giraldo was taken into custody and questioned.  After he was advised of and waived his *Miranda*[4] rights, Giraldo said the Blazer belongs to his father and identified a photograph of the Blazer taken from the bakery surveillance video on the night of the shooting. Giraldo admitted he drove the Blazer to the bakery that night.  He also admitted he was at the bakery on the night of the killing and identified himself on what must have been a photograph taken from the bakery's surveillance video.  He said he ran into someone he knew.  Giraldo said he knows the person as "Marcos."  Marcos had been sitting in a parked car before Giraldo met him that night, and was outside the car when they met. They both entered the bakery and Giraldo got into line to buy bread.

Giraldo said he knew Sanchez and that Marcos used to work for Sanchez, selling heroin.  When Marcos worked for Sanchez, Giraldo said he would call Marcos for heroin and Marcos would either meet him at the bakery or, if no one else was home at Giraldo's residence, Marcos would bring the heroin to his residence.  Giraldo said he saw Marcos earlier that day and asked whether he had any heroin.  Marcos told him he did not, but that he was going to get some from Sanchez down the street from Giraldo's house.  Knowing such exchanges were made at the bakery—Giraldo knew Sanchez buys coffee at the bakery—Giraldo went there and decided to get some bread while he was there.

Sanchez was at the coffee station when Giraldo was standing in line for bread.  A "couple seconds" later, Giraldo heard gunshots.  He said he turned and ran. When he was shown a photograph apparently taken from the surveillance video and asked what it showed, Giraldo said it showed Marcos shooting Sanchez.

---

[4] *Miranda v. Arizona* (1966) 384 U.S. 436.

## II

## DISCUSSION

Giraldo did not testify at the trial.  During the joint trial, the prosecutor introduced into evidence Giraldo's statement that he met "Marcos" at the bakery and that Marcos shot Sanchez.  The jury was instructed the evidence was admitted solely against Giraldo and admonished not to consider the evidence in deciding defendant's guilt.  Defendant contends the introduction of Giraldo's statement violated his right to confrontation under the state and federal Constitutions.

In *Bruton v. United States*, *supra*, 391 U.S. at pages 123-124, the issue was "whether the conviction of a defendant at a joint trial should be set aside although the jury was instructed that a codefendant's confession inculpating the defendant had to be disregarded in determining his guilt or innocence."  After recognizing that juries may generally be relied upon to follow a court's admonition to ignore specific inadmissible evidence, the *Bruton* court stated:  "Nevertheless, as was recognized in *Jackson v. Denno* [(1964) 378 U.S. 368], there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.  [Citations.]  Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial.  Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others.  The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination.  It was against such threats to a fair trial that the Confrontation Clause was directed.  [Citation.]"  (*Bruton v. United States*, *supra*, 391 U.S. at pp. 135-136, fns. omitted.)

7

*People v. Aranda*, *supra*, 63 Cal.2d 518, presaged the high court's decision in *Bruton*. In *Aranda*, a jewelry store was robbed by two men. (*People v. Aranda*, *supra*, 63 Cal.2d at pp. 521-522.) Police found fingerprints of Martinez at the store. Martinez and Aranda were both subsequently arrested and Martinez confessed. (*Id*. at p. 522.) The officer who took Martinez's confession testified that Martinez said on the date of the robbery "'that he and Chop Chop, meaning defendant Aranda,'" robbed the jewelry store. (*Id*. at p. 522, fn. 1.) It is evident from the officer's testimony that Martinez never referred to defendant by name and only referred to him as Chop Chop. (*Ibid*.) The *Aranda* court held it was error, in a joint trial, to admit a confession of a nontestifying codefendant implicating the defendant. The court concluded such an error is "not necessarily cured by an instruction that it is to be considered only against the declarant. [Citations.]" (*Id*. at p. 526.)[5]

"The *Aranda/Bruton* rule addresses a specific issue that arises at joint trials when the prosecution seeks to admit the out-of-court statement of a nontestifying defendant that incriminates a codefendant. As we have observed, '"*Aranda* and *Bruton* stand for the proposition that a 'nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given.' [Citation.]" [Citation.] The United States Supreme Court "limited the scope of the *Bruton* rule in *Richardson v. Marsh* (1987) 481 U.S. 200 . . . . The court explained that *Bruton* recognized a narrow exception to the general rule that juries are presumed to follow limiting instructions, and this narrow exception should not apply to confessions that are not incriminating on their face, but become so only when linked with other evidence introduced at trial.

---

[5] To the extent *Aranda* precludes the introduction of evidence that would not violate the federal Constitution, "it was abrogated in 1982 by the 'truth-in-evidence' provision of Proposition 8." (*People v. Fletcher* (1996) 13 Cal.4th 451, 465.)

8

[Citation.]"' [Citations.] The high court went on to hold in *Richardson* that admission of a nontestifying codefendant's confession against the defendant does not violate the defendant's confrontation right if the confession is redacted to eliminate not only the defendant's name but *any reference to his existence*. [Citation.] 'When, despite redaction, the statement obviously refers directly to the defendant, and involves inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial, the *Bruton* rule applies and introduction of the statement at a joint trial violates the defendant's rights under the confrontation clause.' [Citation.]" (*People v. Capistrano* (2014) 59 Cal.4th 830, 869, italics added.) "The *Aranda*/*Bruton* rule 'declares that a nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given.' [Citation.]" (*People v. Lopez* (2013) 56 Cal.4th 1028, 1053.)

Years after its decision in *Bruton*, the Supreme Court was called upon to determine whether the confession of a nontestifying codefendant could be introduced in a joint trial if the statement was "redacted to omit any reference to the defendant, but the defendant is nonetheless linked to the confession by evidence properly admitted against him at trial." (*Richardson v. Marsh* (1987) 481 U.S. 200, 202.) In *Richardson*, three individuals were involved in a multiple murder/robbery. (*Ibid*.) Marsh and Williams were tried together, but the third individual, Martin, was a fugitive at the time of trial. (*Id*. at pp. 202-203.) Williams did not testify at trial, but his confession was admitted over Marsh's objection. (*Id*. at pp. 203-204.) The confession had been redacted to remove any reference to Marsh. As redacted, the confession stated Williams and Martin committed the crimes and that Martin was the killer. (*Id.* at p. 203, fn. 1.) The jury was instructed that Williams's confession was admitted against him, but was not admitted into evidence against Marsh. (*Id*. at p. 204.)

9

Marsh testified at trial. She said she was in a car with Martin and Williams on the drive to the residence where the crimes took place and heard the two talking, but did not hear what they were talking about. She claimed she did not know what was going to happen at the residence. (*Richardson v. Marsh*, *supra*, 481 U.S. at p. 204.) The Supreme Court found "an important distinction between" the facts in *Bruton* and those present in *Richardson*, "which causes it to fall outside the narrow exception" of *Bruton*. (*Richardson v. Marsh*, *supra*, 481 U.S. at p. 208.) The court stated the confession in *Richardson*, unlike the confession in *Bruton*, "was not incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony)." (*Ibid.*, fn. omitted.) Based on that distinction, the Supreme Court found the trial court did not err in admitting Williams's confession. (*Id.* at p. 211.)

*Richardson* left open the question of whether of "the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun." (*Richardson v. Marsh*, *supra*, 481 U.S. at p. 211, fn. 5.) The high court answered that question in *Gray v. Maryland* (1998) 523 U.S. 185, 196, when it held *Bruton* applies to "statements that, despite redaction, obviously refer directly to someone, often obviously [the defendant], and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." Giraldo's statements come within *Gray*'s ambit. His statement clearly referred to another individual. When asked what the video from the bakery showed, Giraldo said it showed the person he knew as "Marcos" (defendant) shooting Sanchez.

The Attorney General argues Giraldo's statement did not implicate defendant and consequently, it was not testimonial and therefore did not violate *Bruton*. Additionally, it is argued the curative instructions given to the jury "cured any potential harm," and any error was harmless.

Giraldo's statement did implicate defendant. He referred to defendant by the name he knew him, just as the codefendant in *Aranda* did in that case. (*People v.*

10

*Aranda*, *supra*, 63 Cal.2d at p. 522, fn. 1 [identified Aranda as "Chop Chop"].) It is evident from the transcript of Giraldo's statement that he was shown a photograph from the video of the shooting. The jury, of course, saw the video as well. Giraldo identified a photograph from the video as the shooter, Marcos.

The Attorney General's argument that Giraldo's statements were not testimonial because the statements were not offered against defendant is without merit. Such an argument, if accepted, would mean *Bruton* has become a dead letter. The evidence in *Bruton* was not offered against Bruton. Just as in this matter, the jury in *Bruton* was instructed the evidence was admissible only against the nontestifying declarant who made the statement, not the other defendant. Absent a statement from the United States Supreme Court overruling *Bruton*, we reject the argument.

The fact that the jury was instructed to only consider the evidence in determining the guilt of the nontestifying declarant and not to consider the evidence in deciding the case against defendant does not render the error harmless. (*Bruton v. United States*, *supra*, 391 U.S. at p. 137 ["in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination"].) We therefore must determine whether other facts demonstrate beyond a reasonable doubt defendant was not prejudiced by admission of Giraldo's out-of-court statements. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

We conclude the error was harmless. The video showed the shooting of Sanchez. His killer was in the video. The issue was the identity of the shooter. Although Giraldo identified the shooter as the person known to him as "Marcos," that fact did not help the jury determine whether *defendant* was the person seen in the video shooting Sanchez. That decision was informed by the jury's viewing the shooter in the video, looking at defendant in the courtroom, and considering the fact that defendant's fingerprint was on the outside and his DNA was found inside the silver Honda driven to the scene by the shooter. The fact that Giraldo stated the photograph depicted Marcos

11

shooting Sanchez did not add anything to the jury watching the video of the shooting. A different result would follow if identity from the video was difficult and Giraldo identified the shooter as Marcos after having been shown a photographic lineup in which he identified defendant as the person he knows as "Marcos." However, given the fact that did not occur, defendant was identified by witnesses to the crime, the video showed defendant shooting Sanchez, and defendant's DNA was found in the vehicle driven to the scene of the crime by the shooter, Giraldo's statement that "Marcos" shot Sanchez does not appear to have contributed to the jury's verdict.

## III

## DISPOSITION

The judgment is affirmed.

MOORE, J.

WE CONCUR:

RYLAARSDAM, ACTING P. J.

THOMPSON, J.

12